UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| GERALDINE ERWIN, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | 2:19-CV-00227-DCLC-CRW |
| | ) | |
| vs. | ) | |
| | ) | |
| BAE SYSTEMS, ORDNANCE SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Geraldine Erwin ("Erwin") brought this action against her former employer Defendant BAE Systems, Ordnance Systems, Inc. ("BAE"), alleging claims of employment discrimination and retaliation in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-301 *et seq.* ("THRA"), and intentional infliction of emotional distress ("IIED"). Before the Court are BAE's Motion for Summary Judgment [Doc. 37] and Motion for Sanctions [Doc. 40]. The parties have fully briefed the issues and the Court held a hearing on July 19, 2022, during which the parties presented oral argument on both motions [Doc. 62]. For the reasons stated herein, BAE's Motion for Summary Judgment [Doc. 37] and Motion for Sanctions [Doc. 40] are **GRANTED**.

I. **BACKGROUND**

    A. **Factual Background**

Erwin, an African American female, worked in the finance department at the Holston Army Ammunition Plant in Kingsport, Tennessee, which is managed, operated, and maintained by BAE,

1

from 2001 until her termination on January 8, 2019 [Doc. 38, ¶¶ 13, 26; Doc. 56, ¶¶ 13, 26].[1] In 2012, Erwin's supervisor, Kristin Bacon ("Bacon") promoted her to Financial Planning and Analysis Manager [*Id*. at ¶ 33]. But when Bacon gave Erwin a poor performance review at the end of the year, issues arose between the two and Erwin agreed to a demotion to an accountant position in which she would report to the Manager of Corporate Accounting, Randal Lane ("Lane") [*Id*. at ¶¶ 48, 50–52]. The demotion resulted in a change in Erwin's pay grade and, consequently, a reduction in her salary [*Id*. at ¶¶ 71–72]. A few months before Erwin's demotion, Jerry Andrieszyn ("Andrieszyn"), a white male finance employee who worked under Bacon was also moved to a new position under Lane due to poor performance [*Id*. at ¶¶ 53–55]. Erwin alleges, unlike her demotion, Andrieszyn's did not result in a salary reduction [Doc. 56, ¶ 55]. However, she chose not to file an EEOC complaint for gender and/or race discrimination at that time because she "needed her job" [Doc. 17, ¶ 12].

In October 2018, BAE Director of Compliance, Christina Enoch ("Enoch"), interviewed Erwin due to the suggestion by another employee, who had submitted allegations of discrimination while working under the supervision of Lane, that Erwin's demotion was based on race [SMF, ¶¶ 57–58]. When Enoch questioned Erwin about the alleged discriminatory demotion, Erwin advised she did not feel her 2013 "demotion was because she was black or female." [*Id*. at ¶ 59]. Rather, she stated "[i]t was an issue with her boss at the time who was a female." [*Id*.]. Erwin further stated she thought BAE was a "good ole boy network," but never thought her demotion was "a racial or gender issue" and "would never think [Lane] is a racist or sexist," nor was anyone in her department racist or sexist [*Id*. at ¶¶ 59, 61, 62].

---

[1] References to the parties' Statement of Undisputed Material Facts [Doc. 38] and Response to Statement of Undisputed Material Facts [Doc. 56] shall be hereinafter annotated as ("SMF, ¶_").

2

In December 2018, Erwin asked Lane about her 2013 salary reduction, and he recommended she file an official ethics complaint [*Id*. at ¶¶ 113, 114]. As directed, Erwin sent an "ethics question" to Turula Harvey-Miller, a Local Ethics Officer, who forwarded it to corporate ethics [*Id*. at ¶¶ 115, 116]. The question stated, in relevant part:

> I would like to open an ethics investigation to answer the following question: Why was my pay decreased when I was demoted in 2013 but other employees that have been demoted have not had their pay decreased with their change in responsibilities? . . . A similar situation happened to another employee [(Andrieszyn)] by this same Finance Director before it happened to me . . . . I feel as though I was discriminated against and deserve to have my pay rate restored as well as being paid retro pay.

[*Id*. at ¶ 117]. Director of Ethics, Christina Chiriaco ("Chiriaco"), opened an ethics case ("Case 6254") to investigate Erwin's question and arranged an interview with Erwin about the complaint [*Id*. at ¶ 133]. During the interview, Chiriaco asked Erwin how she knew her salary was decreased while others' salaries were not. Chiriaco documented this conversation as follows:

> G Erwin stated that her co-worker by the name of Jerry Andrieszyn also moved positions but kept his pay. When asked how G Erwin knew that the pay of J Andrieszyn had not been cut, G Erwin responded that he did not tell her. T Chiriaco asked again how did she know, and G Erwin responded that she is payroll, has access and looked up J Andrieszyn's salary history.

[*Id*.]. After the interview, Chiriaco became concerned that Erwin used her status as a "Privileged User" in BAE's electronic databases to access Andrieszyn's salary [*Id*. at ¶ 134]. As a Privileged User, Erwin had access to confidential employee financial and payroll information [*Id*. at ¶¶ 119, 120]. BAE's policy governing Privileged Users prohibits access of confidential payroll information other than for the purpose of performing specific job duties [*Id*. at ¶ 123]. To maintain Privileged User status, Erwin had to sign a "Confidentiality of Employee Records and Information" form acknowledging that violating the Privileged User Policy could "result in disciplinary action up to and including termination of employment with [BAE]." [*Id*. at ¶ 126].

3

Due to Chiriaco's concerns regarding Erwin's possible abuse of her status as a Privileged User, she contacted Director of Human Resources Amanda Burns ("Burns"), who opened a separate data privacy ethics case ("Case 6282") to investigate Erwin's potential confidentiality breach [*Id*. at ¶¶ 135, 136]. As part of Case 6282, Chiriaco wrote the following correspondence to BAE in-house counsel:

> This notice serves as a report of a potential privacy incident. During the course of an interview of an employee who raised an ethics concern, the individual admitted to accessing the accounts of co-workers to see if they had their pay decreased when moved into new positions in order to support their personal complaint.

[*Id*. at ¶ 137]. Ultimately, BAE investigators concluded Erwin violated BAE's Privileged Users Policy by accessing Andrieszyn's private salary information [*Id*. at ¶ 138]. Burns discussed the matter with Lane, and Lane terminated Erwin's employment on January 8, 2019 "for violating BAE policies" [*Id*. at ¶¶ 139, 141]. Lane terminated another employee, a white male, for the same policy violation a few years later in 2021 [*Id*. at ¶¶ 152, 153].

Following her termination, Erwin filed another ethics complaint, in which she "asserted she was terminated based on 'hearsay, and she believe[d] this is wrongful.'" [*Id*. at ¶¶ 155, 156]. Erwin asserted she never told Chiriaco that "she looked up" Andrieszyn's historical 2013 salary, but "she saw [his] salary had not changed in the Kronos system, and she 'remembered it' for the next five years 'because it was relevant to what happened to her.'" [*Id*. at ¶¶ 157, 158]. While investigating Erwin's complaint, Burns confirmed with Chiriaco that Erwin "did state that she looked up payroll information for Andrieszyn" [*Id*. at ¶ 161]. Burns and Kim Kaminski ("Kaminski"), the BAE Vice President and Chief Executive Officer, ultimately determined Chiriaco was a "more credible witness" than Erwin [*Id*. at ¶ 162]. Kaminski found Erwin's termination was not discriminatory or retaliatory, and Erwin's post-termination complaint was deemed "unsubstantiated." [*Id*. at ¶ 163]. On April 5, 2019, Erwin filed an EEOC charge against

4

BAE for retaliation [Doc. 1-4]. Specifically, Erwin alleged she was "retaliated against for questioning pay disparity and providing testimony during a discrimination complaint investigation" [*Id*. at pg. 2]. The EEOC issued a right to sue letter on September 27, 2019, and Erwin initiated this action on December 26, 2019 [Doc. 1].

### B. Issues During Discovery

During the course of discovery in this matter, BAE alleges Erwin willfully and in bad faith colluded with her therapist, Anna Owens ("Owens") "to interfere and manipulate discovery" and "fabricate evidence" [Doc. 41, pg. 1]. Erwin began seeing Owens for regular therapy sessions around June 2021 [Doc. 41-9, pgs. 46, 47]. The two frequently communicated via text message, at first primarily to discuss scheduling and payment, and later to discuss other matters including this case [Doc. 41-4]. On August 20, 2021, Owens texted Erwin that she received a subpoena for her therapy notes in relation to Erwin's claim against BAE [*Id*. at pgs. 4, 5]. Owens informed Erwin that the subpoena asked for "everything, including my clinical notes on you, which are Hippa[2] [sic] protected." [*Id*. at pg. 5]. The two discussed whether the notes would be "damaging" to Erwin, and Owens emailed Erwin copies of the notes so she could review them before Owens produced them in discovery [*Id*.]. When Erwin identified some notes she considered to be incorrect, Owens stated she could go back and "tweak" them [*Id*. at pgs. 6, 7]. Owens told Erwin, "I CAN make some changes [to the notes], I just want to talk to you thru each note bc I don't want to send something that sounds out of context." [*Id*. at pg. 7]. Owens told Erwin she wanted the notes to "line up" with what Erwin believed to be true [*Id*.].

On the evening of August 31, 2021, Erwin and Owens spoke on the phone for over an hour and a half, during which time Owens made changes to previous therapy notes from Erwin's

---

[2] This refers to HIPAA, the Health Insurance Portability and Accountability Act of 1996.

5

sessions [Doc. 41-5; Doc. 54-1, pgs. 39–41].  Owens then created a new therapy note for August 31, 2021, which she continued to modify as she and Erwin talked on the phone [*Id.*].  At 8:09 P.M., Owens began the August 31st note with "Geri and I had a session today to go over her notes for accuracy since they will be sent to her attorney." [Doc. 41-5, pg. 5].  By 8:58 P.M., Owens had deleted the phrase "to go over her notes for accuracy since they will be sent to her attorney" so that the line read, "Geri and I had a session today." [*Id.* at pg. 20].  At 9:37 P.M., Owens changed the opening phrase again to read, "Geri presented to session today to discuss her continued frustration over being terminated and to look over her notes for accuracy." [Doc. 41-7, pg. 22].  At 9:38 P.M., she deleted "and to look over her notes for accuracy." [*Id.* at pg. 23].  When Owens finished the note for August 31, 2021, there was no trace of her initial comments that she and Erwin had met to go over her past therapy notes for accuracy.  After the phone conversation ended, Owens texted Erwin:

> Sorry that took so long but [I] do think the notes are so much better. I'll therapize them tomorrow, pray over them, and give it to God! . . . I truly believe that God will use these notes as a help for you to win this case and right this injustice[.]

[Doc. 41-4, pg. 9].

The next day, Erwin texted Owens to ask, "did you therapitize me and get that sent . . . ." and Owens responded, "therapized and sent w a prayer." [41-4, pg. 10].  After Erwin asked if she would be charged for a therapy session on August 31st, Owens replied that she would charge her because it was the length of a session even though "[a phone call discussing the notes] was all [Erwin] got" out of the session [*Id.*].

During Erwin's September 28, 2021 deposition, BAE's attorney questioned her about Owens's therapy notes:

> Q: So are you telling me that all of these notes were drafted after the subpoena was received?

> A: No, I didn't say that.
>
> Q: Oh I thought you said: "We received the subpoena, but it was after all this." What are you referring to when you say "after all this"?
>
> A: She received the subpoena on the 13th, and these are just regular notes from our sessions. I see her every two weeks, sometimes once a month.
>
> Q: Okay.
>
> A: It was just a normal session.
>
> Q: Did you review and comment on these notes before they were produced in the case?
>
> A: I didn't read them.
>
> Q: Did you comment on them?
>
> A: I only -- only just to tell her to send them.
>
> . . .
>
> Q: You reviewed these notes before they were produced in the case. Correct?
>
> A: I read them.
>
> Q: And, if they were inaccurate, you would have told Owens. Correct?
>
> A: No, because she couldn't change them.

[Doc. 41-10, pgs. 323, 326]. During Owens' deposition on September 30, 2021, she admitted that she and Erwin had indeed discussed and changed the therapy notes:

> Q: Let me ask you a question on these notes that go through 9/11. These notes embed [revisions] that Ms. Erwin made to your notes; isn't that right?
>
> A: Yes.

[Doc. 41-9, pg. 83]. It became clear during Owens' deposition that there were multiple, conflicting versions of the therapy notes, and that Erwin had not produced everything in discovery [*Id*. at pgs.

7

83-85]. Owens' deposition was cut short and rescheduled for a later date so that the notes and texts between Erwin and Owens could be produced and reviewed [*Id.*].

On October 8 and 9, 2021, Owens sent Erwin voluminous texts about her anxiety over producing the texts and notes, and how the two had incriminated themselves through their text messages:

> I so wish this hadn't happened this way. I just knew we'd have a chance to read the texts and get our stories matching but either one of us submitted them. I'm just so so sorry. I'm more sorry than I think you will ever know. I know you needed that money. And I wanted so badly to help you get it bc you are telling the truth. One little thing derailed the entire thing. Are you SURE you can't find out if he's read them or not and if he hasn't or if he hasn't sent them to Josh yet, us delete the same thing and send them in so you don't have to throw in the towel? Obviously I'm not sending any of these last exchanges.
> . . .
> if he hasn't read them, and you tell him you have a better platform that's easier to read, and you take those days out, and I take those days out, how could they possibly ever find out we did it? Unless they subpoenaed the phone company. If the notes match, they have no reason to do that, especially if we leave all that stuff in w me asking you about the depo and stuff like that. That's borderline incriminating but not gonna make me lose my license or your credibility.
> . . .
> I hate it bc both of us texted incriminating things when there was absolutely no need. Like you were telling the truth, [I] was telling the truth, but we just took it one step too far. And [I] had in my head like you know how before [I] gave anybody anything about the 2 of us [I] wanted to run it by you to make sure it was clean, I thought you were gonna run anything about the 2 of us you were gonna run it by me, or we coulda read it and decided what needed to come out just like we did the notes . . . We needed to just team huddle before those texts went in. Same w emails, like we did w the notes. And you'd have that money
> . . .
> If we hadn't obviously colluded on the last note and set up a phone call (which will match with our phone list) to do the note together, AND if I had come up w the brilliant "I just want it to say what you want it to say" your credibility wouldn't be out the window and neither would mine. Oh and if you hadn't asked me if I'd therapized the note before [I] sent it in. . .

[Doc. 41-1, pgs. 28–29, 34]. While Erwin did not reply through text often, Owens mentioned that Erwin was replying through voice messages [*Id.* at pg. 29]. On October 13, 2021, Owens texted Erwin another barrage of messages, including:

> So [BAE's attorney] still wants my text messages? . . . Why? What you said did incriminate you and and [sic] what I said incriminated me
> . . .
> After this week I'm gonna resign. I have no choice. It shows collusion and he's pounding me in the face every day and now threatening to take me to court . . . once I get his incriminating notes to him that's gonna incriminate us both so you're gonna lose this case[.]
> . . .
> [BAE's attorney is] gonna read what you said and incriminate you and I'll do the best I can [in deposition] but it is incriminating for you. But if you're gonna go all the way w this even w these incriminating notes bc they incriminate us both, then I have to also go thru another bully session with him. And then I will be checking myself into Vanderbilt Psychiatric bc the notes will do me and you both in.
> . . .
> I'm gonna get him all this stuff tonight so hopefully he won't take me to court. I just know the second subpoena is gonna put me over the top[.]

[Doc. 41-4, pg. 40]. During this flurry of text messages, Erwin was apparently trying to call Owens, because Erwin texted, "Stop and answer" to which Owens responded "I'll call you ASAP. Not mad, just terrified." [*Id*.].

On October 13, 2021, Erwin produced 35 text messages between her and Owens from June 4, 2021 to October 4, 2021 [Doc. 41-11], but omitted all texts after October 4, 2021, including the above-quoted texts from Owens. BAE's attorney sought to verify that Erwin would produce all of her texts and emails with Owens by the discovery deadline of October 15, 2021 [*Id*. at pg. 1]. Erwin, however, did not produce the post-October 4th texts by the discovery deadline. Despite this, Erwin's attorney emailed BAE's attorney on October 19th to assure him that Erwin had produced "all of the post-deposition documents she could locate." [Docs. 41-12, 54-2]. Erwin did not produce the rest of the text messages until after she learned that Owens herself had sent them directly to BAE's attorney on October 15, 2021 [Doc. 41-1, pg. 2].

During her later November 2021 and February 2022 depositions, Owens repeatedly admitted to creating and modifying her therapy notes to support Erwin's allegations against BAE:

9

> Q: …what you and Ms. Erwin ultimately end up doing is trying to make sure that your notes tracked with her allegations in this case; is that right?
>
> A: The last note we did . . .
>
> . . .
>
> Q: And so what was happening here on this two-hour call [on August 31, 2021] is [Erwin is] giving you a story and you're transcribing what she's telling you; is that fair?
>
> A: That's fair.
>
> . . .
>
> Q: So you're recognizing that these [therapy notes with Erwin] are prepared for litigation; correct?
>
> A: Correct.

[Doc. 41-9, pg. 132; Doc. 54-1, pgs. 36, 40].

## II. DISCUSSION

On March 21, 2022, BAE moved for summary judgment on the entirety of Erwin's claims and for sanctions against Erwin for the above-referenced collusion with Owens [Docs. 37, 40]. On July 19, 2022, the parties appeared before the Court and presented oral argument on both motions. The Court will first address BAE's Motion for Summary Judgment [Doc. 37] before turning to the Motion for Sanctions [Doc. 40].

### A. Motion for Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the Court must view the facts contained in the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the initial burden of demonstrating that no genuine issue of material facts exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "come forward with significant probative evidence showing that a genuine issue exists for trial." *McKinley v. Bowlen*, 8 F. App'x 488, 491 (6th Cir. 2001). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the nonmoving party based on the record. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

BAE argues it is entitled to judgment as a matter of law on each of Erwin's claims. In response, Erwin abandoned her IIED claim and expressed that she is not suing BAE for gender or race discrimination under Title VII, § 1981, or the THRA [Doc. 55, pg. 1]. Thus, the only remaining claims are those for retaliation in violation of Title VII, § 1981, and the THRA, all of which are analyzed under the same framework. *See Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 464 (6th Cir. 2001) (holding that claims of retaliation on the basis of race under the THRA and § 1981 "are governed by the same burden-shifting standards as the claims under Title VII."); *see also Fite v. Comtide Nashville, LLC*, 686 F. Supp. 2d 735, 753 (M.D. Tenn. 2010) ("Section 1981 and the THRA provide protection against workplace retaliation and claims under both statutes are analyzed under the Title VII burden-shifting framework.").

Title VII prohibits employers from retaliating against employees for opposing unlawful employment practices. 42 U.S.C. § 2000e-3(a). When, as here, a claim of retaliation is based on circumstantial evidence, courts employ the *McDonnell Douglas* burden-shifting framework. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under that standard, the "[p]laintiff bears the initial burden to establish a *prima facie* case of retaliation." *Id*. "If the plaintiff succeeds in making out the elements

11

Case 2:19-cv-00227-DCLC-CRW Document 63 Filed 09/20/22 Page 11 of 20 PageID #: 3145

of a *prima facie* case, the burden of production of evidence shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (internal quotations and citations omitted). Finally, "[i]f the defendant satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate 'that the proffered reason was not the true reason for the employment decision[,]'" i.e., the reason is pretextual. *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Erwin alleges BAE unlawfully terminated her in retaliation for her December 2018 ethics complaint in which she questioned whether her 2013 demotion was discriminatorily motivated by gender and race [Doc. 17, ¶ 34].[3] In contrast, BAE argues there is no genuine dispute that Lane terminated Erwin due to her violation of BAE's Privileged Users policy by looking up Andrieszyn's salary records [Doc. 64, pg. 4]. Consequently, BAE contends Erwin cannot establish a *prima facie* case of retaliation and, even if she can, she cannot show that BAE's legitimate reason for her termination was pretextual.

### 1. *Prima Facie* Case of Retaliation

"The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 523 (6th Cir. 2008). A *prima facie* case of retaliation requires a plaintiff to establish that:

> (1) [she] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.

---

[3] Although BAE interpreted Erwin's retaliation claims to be based on her participation in the October 2018 interview in connection with another employee's allegations of discrimination, Erwin clarified in her response that her retaliation claims under Title VII, § 1981, and the THRA are all "based upon BAE's discharging her in January 2019 in 'retaliation' for her objecting to and questioning her discriminatory salary reduction in 2013." [Doc. 55, pg. 1].

12

*Dixon*, 481 F.3d at 333. There is no dispute that Erwin has met the first three elements of her *prima facie* retaliation claim. She engaged in protected activity when she filed an official ethics complaint alleging BAE discriminated against her when it demoted her and reduced her pay. *See Laster*, 746 F.3d at 730 (holding that Title VII's "opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices."). BAE also knew about Erwin's complaint and took an adverse employment action against Erwin when it terminated her on January 8, 2019. BAE contends, however, that Erwin has not established causation.

To prove causation, Erwin must show that her protected activity was a "but for" cause of the adverse action, meaning that her termination would not have occurred absent BAE's desire to retaliate. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 133 S. Ct. 2517–28 (2013) (holding that Title VII retaliation claims "require proof that the desire to retaliate was the but-for cause of the challenged employment action"). BAE asserts it would have terminated Erwin for violating the Privileged User policy, regardless of whether the violation was disclosed in the context of an ethics complaint [Doc. 61, pg. 20]. In response, Erwin contends causation can be inferred from the inadequacy of BAE's reason for the termination and the temporal proximity between the ethics complaint and her termination [Doc. 55, pg. 23].

Erwin's argument regarding the inadequacy of BAE's proffered reason for terminating her is inapposite, as it goes to the issue of pretext and does not create an inference of causation. The temporal proximity between her ethics complaint and termination, however, is sufficient to create such an inference. *See Mickey*, 516 F.3d at 525 ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the

13

purposes of satisfying a prima facie case of retaliation."). BAE terminated Erwin approximately one month after she filed the ethics complaint. Based upon this short lapse of time, a reasonable juror could conclude that Erwin's complaint was a but-for cause of her termination. *See Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) (holding that "a lapse of two months . . . is sufficient to show a causal connection, and the district court erred in holding otherwise.").

Accordingly, Erwin has satisfied her burden of establishing a *prima facie* case of retaliation. The burden thus shifts to BAE to articulate a legitimate reason for its decision to terminate Erwin and, thereafter, she is tasked with demonstrating that BAE's proffered reason is pretextual. *Dixon*, 481 F.3d at 333.

### 2. BAE's Proffered Legitimate Reason and Pretext

BAE has presented a legitimate, nondiscriminatory reason for terminating Erwin—that she violated BAE's policy when she used her Privileged User status to access confidential salary information. As required under the burden-shifting framework, Erwin asserts BAE's proffered reason is pretextual. "A plaintiff may establish that an employer's stated reason for its employment action was pretextual by showing that the reason (1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009).

Erwin bases her pretext argument on the first category— that is, BAE's reason for terminating her had no basis in fact because she never told Chiriaco she looked up Andrieszyn's salary information, but only meant to convey she had learned the information in the normal course of her authorized work on payroll. She claims Chiriaco falsified her report to create the impression that Erwin had "recently accessed [Andrieszyn's] salary history" in an unauthorized manner, when in fact Erwin had learned the salary information years before as part of her job [Doc. 55, pg. 9].

14

BAE contends that even if Erwin did not admit that she improperly accessed Andrieszyn's information, BAE personnel held an honest belief that she did, and this is enough to defeat Erwin's claim of pretext. "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Marshall*, 854 F.3d at 380 (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). This rule applies "where the employer reasonably relied on the particularized facts that were before it at the time the decision was made." *Id*. (internal quotations omitted). "If the employer honestly, albeit mistakenly, believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent." *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)).

BAE has established that it honestly believed Erwin violated company policy by accessing confidential salary information. It is undisputed that Erwin had Privileged User status. Erwin also told Chiriaco she had knowledge of Andrieszyn's salary through her work on payroll, and Chiriaco opened an ethics case to investigate what she perceived as Erwin's potential violation of BAE's policy. As part of that investigation, Chiriaco reached out to Burns and in-house counsel to determine how to proceed. Following an official investigation, Erwin's violation of BAE policy was substantiated. Erwin does not dispute that unauthorized access of confidential information by a BAE Privileged User was a terminable offense, according to BAE's written policy. BAE has also established that Lane terminated another employee, a white male, from Erwin's accounting department for accessing private payroll information in a similar manner. All of the evidence supports a finding that BAE honestly believed Erwin misused her privileged access to employee accounts in violation of BAE's confidentiality policy, and that this was a terminable offense.

15

When an employer has shown it had an honest belief based on particularized facts, the employee must then produce "'proof to the contrary' that challenges the foundation of the employer's belief or lose on summary judgment." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (internal citations omitted); *see also Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 611 (6th Cir. 2013) (quoting *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (To show pretext, an employee must show the employer's "business decision was so lacking in merit as to call into question its genuineness."). Here, Erwin has not produced any proof to contradict BAE's honest belief. Even Erwin's own summary of her conversation with Chiriaco supports Chiriaco's version of events. In her deposition Erwin testified:

| | |
|---|---|
| Erwin: | But then [Chiriaco] went on to accuse me of talking to Jerry Andrieszyn about it, which I did not do. And then she went on to ask me how I knew, and that's when I said: "I work in payroll, so I have access to the information." |
| Attorney: | Did you tell [Chiriaco] that it was knowledge you already had? |
| Erwin: | I did not convey that to her, that it was knowledge I already had; but I also did not tell her I looked the information up. She is assuming something and putting it in writing . . . . |

[Doc. 270:6–23; 230:9–14]. Erwin testified that she told Chiriaco, in the present tense: "I have access to [Andrieszyn's salary] information," and she never told Chiriaco the information was knowledge she already had. This could plausibly lead Chiriaco to believe Erwin had recently looked up Andrieszyn's information to support her ethics complaint. By Erwin's own account, she said nothing to Chiriaco to clarify or disabuse her of any wrong assumptions. Erwin has not shown proof that BAE's decision to fire her "was so lacking in merit as to call into question its genuineness." *Carter*, 529 F. App'x at 611. On the contrary, Erwin's testimony and proof work to bolster BAE's honest belief defense.

In sum, despite Erwin's ability to establish a *prima facie* case of retaliation, BAE has shown it held an honest belief in its legitimate, nondiscriminatory reason for firing Erwin, and Erwin has not carried her burden of showing pretext. Accordingly, BAE is entitled to judgment as a matter of law on Erwin's claims of retaliation under Title VII, § 1981, and the THRA, and BAE's Motion for Summary Judgment [Doc. 37] is **GRANTED**.

**B.     Motion for Sanctions**

Turning to BAE's Motion for Sanctions [Doc. 40], BAE asserts sanctions are warranted due to Erwin's "willful and bad-faith collusion with her therapist to interfere and manipulate discovery, fabricate evidence and perpetrate a fraud on the Court and counsel as officers of the Court." [Doc. 41]. Specifically, BAE claims that (1) Erwin and Owens "colluded to generate therapy records" designed specifically to aid Erwin in this litigation, (2) Erwin intentionally concealed evidence by failing to produce her texts with Owens, and (3) Erwin perjured herself when she stated under oath that she and Owens had not altered the therapy notes after they had been subpoenaed [*Id.*].

"Federal litigation constitutes a search for truth." *Esposito v. Suffolk Cty. Cmty. Coll.*, 517 F. Supp. 3d 126, 127 (E.D.N.Y. 2021). When a plaintiff "attempt[s] to tamper with or fabricate evidence . . . [t]he result can be a costly detour that threatens to undermine the protections built into the system and fundamentally impede the process." *Id*. It is "elementary that a federal district court possesses the inherent power to deny the court's processes to one who defiles the judicial system by committing a fraud on the court." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989). Under this inherent power, a court may go as far as dismissing a complaint upon a showing of bad faith by a litigant, to "prevent the perpetration of fraud on the court." *Pryor v.*

*Shinseki,* No. 3:13-CV-1438-J-39JRK, 2015 WL 13333045, at *1 (M.D. Fla. Feb. 20, 2015) (citing *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009))

"A fraud on the court occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude*, 892 F.2d at 1118. While bad faith in litigation takes many forms, intentional fabrication of evidence constitutes a "near-classic example" of fraud on the court. *Id*. Likewise, committing perjury can warrant severe sanctions, including dismissal. *See Pope v. Fed. Exp. Corp.*, 974 F.2d 982, 984 (8th Cir. 1992). Failing to disclose or produce discoverable documents is also sanctionable by operation of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 37. Sanctions for discovery violations can include payment of reasonable attorney's fees and costs associated with the failure to produce, and dismissal. Fed.R.Civ.P. 37 (b)(2)(A)(i)-(vii), (d)(3).

Here, the evidence is overwhelming that Erwin worked with Owens to alter and create therapy notes to support her retaliation and discrimination claims against BAE, and that she perjured herself when she denied having done so. After her deposition, Erwin continued with such deception when she withheld several days' worth of incriminating texts between herself and Owens, despite BAE's repeated requests for production of such texts.

Erwin contends she is innocent of any intentional manipulation of the notes because she "was relying upon Ms. Owens' expertise as a licensed therapist to know what to do and [Erwin] did not suggest that [Owens] actually make any changes to her notes." [Doc. 45, pg. 8]. To be sure, Owens was the first to suggest she "tweak" the notes for accuracy [Doc. 41-4, pg. 6]. But this does not exonerate Erwin from participating in changing the therapy notes and trying to hide

18

the evidence of that manipulation after the fact.  Erwin admits she spoke with Owens on the phone on August 31, 2021 so she could "re-describe the significant adverse employment events at BAE" for Owens to type up into notes [Doc. 45, pg. 7].  With full awareness that the notes had been subpoenaed and would be turned over for litigation of this matter, Erwin reviewed the notes and discussed them at length with Owens in that phone call.  Erwin also knew that Owen planned to "therapize" the notes after the call so they would appear to have been prepared during a regular therapy session.  Erwin even reminded Owens to "therapitize me" and get the notes sent to the attorneys the next day [*Id*. pg. 9].

Erwin's bad faith did not stop at the collusion with Owens regarding the notes.  She then perjured herself, falsely claiming in her deposition that she did not read or review the notes, and that Owens was unable to change the notes.  Finally, Erwin represented to her attorney that she had produced all of the texts between herself and Owens by the discovery deadline, when in fact she only produced texts up to and including October 4th.   Erwin cannot claim she did not have access to later texts between the two, because she readily produced them once she realized Owens had already done so.

The record is rife with clear and convincing evidence that Erwin intentionally interfered with the fair and impartial proceedings of this Court to gain an unfair advantage in this case, namely the manipulation of discovery materials and the subsequent attempts to hide evidence of that manipulation.  Erwin's behavior is a "classic example" of fraud on the Court that warrants severe sanctions. *Pope.*, 974 F.2d at 984.  Her actions also constitute a willful violation of the Federal Rules and this Court's orders. *See* Fed.R.Civ.P. 26(a), 37; [Doc. 29].  The Court finds these actions so egregious that dismissal is appropriate, however this case has been resolved on the motion for summary judgment. *See* discussion *infra*.   Accordingly, the Court finds it

19

Case 2:19-cv-00227-DCLC-CRW   Document 63   Filed 09/20/22   Page 19 of 20   PageID #: 3153

appropriate to order sanctions against Erwin in the form of reasonable attorneys' fees and costs associated with BAE's Motion for Sanctions.

III.     **CONCLUSION**

For the reasons stated herein, BAE's Motion for Summary Judgment [Doc. 37] and Motion for Sanctions [Doc. 40] are **GRANTED**. BAE shall provide an accounting of its reasonable attorneys' fees and costs *related to* its motion for sanctions by **September 27, 2022**, for the Court's consideration. A separate judgment shall enter.

**SO ORDERED:**

s/Clifton L. Corker
United States District Judge

20

Case 2:19-cv-00227-DCLC-CRW   Document 63   Filed 09/20/22   Page 20 of 20   PageID #: 3154