UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| GERALDINE ERWIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 2:19-CV-00227-DCLC-CRW |
| v. | ) | |
| | ) | |
| BAE SYSTEMS, ORDNANCE SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant BAE Systems, Ordnance Systems, Inc.'s ("BAE's"), request for attorney's fees after the Court granted its motion for sanctions [Doc. 65]. The Court found that during the litigation, Plaintiff Geraldine Erwin ("Erwin") colluded with her therapist to generate therapy records designed to boost her damages if she prevailed on her discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The Court also found that she concealed evidence by failing to produce her own texts with her therapist and that she had perjured herself when she stated under oath that she and her therapist had not altered the therapy notes after they had been subpoenaed. BAE promptly filed the present motion for attorneys' fees pursuant to the Court's memorandum opinion and order [Doc. 65]. Erwin has responded [Doc. 71]. For the reasons below, BAE's motion [Doc. 65] is **GRANTED IN PART AND DENIED IN PART**.

II. **BACKGROUND**

Erwin, an African American female, worked for BAE from 2001 until her termination on January 8, 2019 [Doc. 38, ¶¶ 13, 26; Doc. 56, ¶¶ 13, 26]. On September 20, 2022, the Court granted

1

summary judgment for BAE because of Erwin's failure to show that BAE's stated reason for firing her—that she violated data-security policy—was pretext for retaliation for protected conduct [Doc. 63].

BAE's motion for summary judgment was accompanied by a motion for sanctions against Erwin [Doc. 40]. That motion documented collusion between Erwin and her therapist, Anna Owens, to tamper with Owens' notes from therapy sessions that were then subject to a subpoena [*See* Doc. 41, pgs. 1–8]. BAE alleged that Erwin then lied in her deposition, testifying that the notes were unaltered and that Owens could not have edited them if she had wanted to [*Id.* at 9–10]. BAE further asserted that Erwin failed to turn over text messages containing evidence of the tampering, instead opting to make an incomplete disclosure of text messages between herself and Owens [*Id.* at 8–9].

Erwin began seeing Owens for regular therapy sessions around June 2021 [Doc. 41-9, pgs. 46–47]. The two frequently communicated via text message, at first primarily to discuss scheduling and payment, and later to discuss other matters including this case [Doc. 41-4]. On August 20, 2021, Owens messaged Erwin about the subpoena and told her it asked for "everything, including my clinical notes on you, which are Hippa[1] [sic] protected" [*Id.* at 4–5]. The two discussed whether the notes would be "damaging" to Erwin, and Owens emailed Erwin copies of the notes so she could review them before Owens produced them in discovery [*Id.*]. When Erwin identified some notes she considered to be incorrect, Owens stated she could go back and "tweak" them [*Id.* at 6–7]. Owens told Erwin, "I CAN make some changes [to the notes], I just want to talk to you thru each note bc I don't want to send something that sounds out of context" [*Id.* at 7]. Owens told Erwin she wanted the notes to "line up" with what Erwin believed to be true [*Id.*].

---

[1] This refers to HIPAA, the Health Insurance Portability and Accountability Act of 1996.

Erwin worked with Owens to "point[] out the factual inconsistencies" [Doc. 41-10, pg. 467].

On the evening of August 31, 2021, Erwin and Owens spoke on the phone for over an hour and a half, during which time Owens made changes to previous therapy notes from Erwin's sessions [Doc. 41-5; Doc. 54-1, pgs. 39–41]. Owens then created a new therapy note for August 31, 2021, which she continued to modify as she and Erwin talked on the phone [*Id.*]. At 8:09 P.M., Owens began the August 31 note with "Geri and I had a session today to go over her notes for accuracy since they will be sent to her attorney" [Doc. 41-5, pg. 5]. By 8:58 P.M., Owens had deleted the phrase "to go over her notes for accuracy since they will be sent to her attorney" so that the line read, "Geri and I had a session today" [Doc. 41-6, pg. 20]. At 9:37 P.M., Owens changed the opening phrase again to read, "Geri presented to session today to discuss her continued frustration over being terminated and to look over her notes for accuracy" [Doc. 41-7, pg. 22]. At 9:38 P.M., she deleted "and to look over her notes for accuracy" [*Id.* at pg. 23]. When Owens finished the note for August 31, 2021, there was no trace of her initial comments that she and Erwin had met to go over her past therapy notes for accuracy. After the phone conversation ended, Owens texted Erwin:

> Sorry that took so long but [I] do think the notes are so much better. I'll therapize them tomorrow, pray over them, and give it to God! . . . I truly believe that God will use these notes as a help for you to win this case and right this injustice[.]

[Doc. 41-4, pg. 9].

The next day, Erwin texted Owens to verify whether Owens had edited the notes taken on their call to make it appear as though Owens had taken them during an ordinary therapy session, asking, "did you therapitize me and get that sent . . . ." [Doc. 41-4, pg. 10]. Owens responded, "therapized and sent w a prayer" [*Id.*]. After Erwin asked if she would be charged for a therapy session on August 31, Owens replied that she would charge her because it was the length of a session even though "[a phone call discussing the notes] was all [Erwin] got" out of the session

3

[*Id.*].

During Erwin's September 28, 2021 deposition, BAE's attorney questioned her about Owens's therapy notes:

> Q: So are you telling me that all of these notes were drafted after the subpoena was received?
>
> A: No, I didn't say that.
>
> Q: Oh I thought you said: "We received the subpoena, but it was after all this." What are you referring to when you say "after all this"?
>
> A: She received the subpoena on the 13th, and these are just regular notes from our sessions. I see her every two weeks, sometimes once a month.
>
> Q: Okay.
>
> A: It was just a normal session.
>
> Q: Did you review and comment on these notes before they were produced in the case?
>
> A: I didn't read them.
>
> Q: Did you comment on them?
>
> A: I only—only just to tell her to send them.
>
> . . .
>
> Q: You reviewed these notes before they were produced in the case. Correct?
>
> A: I read them.
>
> Q: And, if they were inaccurate, you would have told Owens. Correct?
>
> A: No, because she couldn't change them.

[Doc. 41-10, pgs. 335, 338].

During Owens' deposition on September 30, 2021, she admitted that she and Erwin had indeed discussed and changed the therapy notes:

> Q: Let me ask you a question on these notes that go through 9/11. These notes embed [revisions] that Ms. Erwin made to your notes; isn't that right?
>
> A: Yes.

4

[Doc. 41-9, pg. 83]. It became clear during Owens' deposition that there were multiple, conflicting versions of the therapy notes, and that Erwin had not produced everything in discovery [*Id.* at 83-85]. Owens' deposition was cut short and rescheduled for a later date so that the notes and texts between Erwin and Owens could be produced and reviewed [*Id.*].

On October 8 and 9, 2021, Owens sent Erwin voluminous texts about her anxiety over producing the texts and notes, and how the two had incriminated themselves through their text messages:

> I so wish this hadn't happened this way. I just knew we'd have a chance to read the texts and get our stories matching but either one of us submitted them. I'm just so so sorry. I'm more sorry than I think you will ever know. I know you needed that money. And I wanted so badly to help you get it bc you are telling the truth. One little thing derailed the entire thing. Are you SURE you can't find out if he's read them or not and if he hasn't or if he hasn't sent them to Josh yet, us delete the same thing and send them in so you don't have to throw in the towel? Obviously I'm not sending any of these last exchanges.
>
> . . .
>
> if he hasn't read them, and you tell him you have a better platform that's easier to read, and you take those days out, and I take those days out, how could they possibly ever find out we did it? Unless they subpoenaed the phone company. If the notes match, they have no reason to do that, especially if we leave all that stuff in w me asking you about the depo and stuff like that. That's borderline incriminating but not gonna make me lose my license or your credibility.
>
> . . .
>
> I hate it bc both of us texted incriminating things when there was absolutely no need. Like you were telling the truth, [I] was telling the truth, but we just took it one step too far. And [I] had in my head like you know how before [I] gave anybody anything about the 2 of us [I] wanted to run it by you to make sure it was clean, I thought you were gonna run anything about the 2 of us you were gonna run it by me, or we coulda read it and decided what needed to come out just like we did the notes . . . We needed to just team huddle before those texts went in. Same w emails, like we did w the notes. And you'd have that money
>
> . . .
>
> If we hadn't obviously colluded on the last note and set up a phone call (which will match with our phone list) to do the note together, AND if I had come up w the

brilliant "I just want it to say what you want it to say" your credibility wouldn't be out the window and neither would mine. Oh and if you hadn't asked me if I'd therapized the note before [I] sent it in. . .

[Doc. 41-1, pgs. 28–29, 34]. While Erwin did not reply through text often, Owens mentioned that Erwin was replying through voice messages [*Id.* at 29]. On October 13, 2021, Owens texted Erwin another barrage of messages, including:

> So [BAE's attorney] still wants my text messages? . . . Why? What you said did incriminate you and and [sic] what I said incriminated me
>
> . . .
>
> After this week I'm gonna resign. I have no choice. It shows collusion and he's pounding me in the face every day and now threatening to take me to court . . . once I get his incriminating notes to him that's gonna incriminate us both so you're gonna lose this case[.]
>
> . . .
>
> [BAE's attorney is] gonna read what you said and incriminate you and I'll do the best I can [in deposition] but it is incriminating for you. But if you're gonna go all the way w this even w these incriminating notes bc they incriminate us both, then I have to also go thru another bully session with him. And then I will be checking myself into Vanderbilt Psychiatric bc the notes will do me and you both in.
>
> . . .
>
> I'm gonna get him all this stuff tonight so hopefully he won't take me to court. I just know the second subpoena is gonna put me over the top[.]

[Doc. 41-4, pg. 40]. During this flurry of text messages, Erwin was apparently trying to call Owens, because Erwin texted, "Stop and answer" to which Owens responded "I'll call you ASAP. Not mad, just terrified" [*Id.*].

On October 13, 2021, Erwin produced 35 text messages between her and Owens from June 4, 2021 to October 4, 2021 [Doc. 41-11], but omitted all texts after October 4, 2021, including the above-quoted texts from Owens. BAE's attorney sought to verify that Erwin would produce all of her texts and emails with Owens by the discovery deadline of October 15, 2021 [*Id.* at pg. 1]. Erwin, however, did not produce the post-October 4th texts by the discovery deadline. Despite

6

this, Erwin's attorney emailed BAE's attorney on October 19th to assure him that Erwin had produced "all of the post-deposition documents she could locate" [Docs. 41-12, 54-2]. Erwin did not produce the rest of the text messages until after she learned that Owens herself had sent them directly to BAE's attorney on October 15, 2021 [Doc. 41-1, pg. 2].

During her later November 2021 and February 2022 depositions, Owens repeatedly admitted to creating and modifying her therapy notes to support Erwin's allegations against BAE:

> Q: …what you and Ms. Erwin ultimately end up doing is trying to make sure that your notes tracked with her allegations in this case; is that right?
>
> A: The last note we did . . .
>
> . . .
>
> Q: And so what was happening here on this two-hour call [on August 31, 2021] is [Erwin is] giving you a story and you're transcribing what she's telling you; is that fair?
>
> A: That's fair.
>
> . . .
>
> Q: So you're recognizing that these [therapy notes with Erwin] are prepared for litigation; correct?
>
> A: Correct.

[Doc. 41-9, pg. 132; Doc. 54-1, pgs. 36, 40].

Faced with this overwhelming evidence that Erwin fabricated evidence, perjured herself, and committed discovery violations, the Court granted BAE's motion for sanctions, indicating that an award of attorneys' fees was appropriate [Doc. 63, pgs. 18–20]. This motion followed. In it, BAE catalogs at least 71.3 hours of attorneys' time spent on its motion for sanctions, resulting in fees of $24,164.00, plus $5,483.21 in discovery costs [Doc. 65].[2]

---

[2] BAE's claimed expenses total $5,483.21, not $5,443.21 [*See* Doc. 65-2, pgs. 2, 4–5].

## III. DISCUSSION

The Court has inherent authority to sanction litigants' bad-faith conduct. *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 511 (6th Cir. 2002) (citing *Chambers v. NASCO, Inc*, 501 U.S. 32, 38 (1991)). Fraud on the court, a variety of bad-faith conduct, "occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989).

A party who lies to the court hinders the judicial system's mission of finding the truth. *See McMunn v. Memorial Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002) ("Our judicial system … relies on litigants to tell the truth . . . .") (collecting cases). "[T]ampering with the administration of justice . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated . . . ." *Aoude*, 892 F.2d at 1119 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)). An appropriate sanction will therefore deter the wrongdoer and others from future abuses. *See Slate v. Am. Broad. Cos.*, 941 F. Supp. 2d 27, 52 (D.D.C. 2013).

Then there is the harm to the opposing litigant. On discovering that documents and testimony are false, the opposing party must spend time and money to determine the extent of the fraud, find out the truth, then prove the fraud. *See, e.g.*, *McMunn*, 191 F. Supp. 2d at 447, 452 (detailing "extensive investigative efforts" to counteract a pattern of deception by a plaintiff, including issuing third-party subpoenas and hiring private investigators and experts).

8

Thus, in determining the appropriate sanction, the Court is guided by the approach employed by courts in the Second Circuit, which calls for a sanction that will (1) deter litigants from future fraud, (2) "place the risk of erroneous judgment on the party who wrongfully created the risk," and (3) compensate the opposing party for expenses incurred because of the fraud. *Id.* at 461 (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

The need for deterrence in this case is significant. Erwin consciously engaged in a pattern of tampering with evidence and lying to cover her tracks. After Owens suggested that the notes could be tweaked, Erwin reviewed them with her for—as Erwin called it in her post-discovery deposition— "factual inconsistencies" [Doc. 41-10, pg. 467]. The next day, she ensured that the fabrication was concealed, asking Owens if the notes had been "therapitize[d]," that is, made to look like Owens took them during an ordinary session [Doc. 41-4, pg. 10]. Erwin dug herself deeper where in her deposition she stated under oath that that she did not read the notes, and her only comment to Owens was "only just to tell her to send them" [Doc. 41-10, pg. 335]. Then, as the deception was coming to light, Erwin withheld some text messages containing evidence of the collusion with Owens rather than complying in full with a valid discovery request from opposing counsel [*See* Doc. 41-11]. To her credit, Erwin has apologized to the Court and BAE for her actions, [Doc. 72, ¶¶ 1–2] but that apology does not mitigate the seriousness of her conduct, and it comes only after all the facts became clear.

Any procedural sanction, such as jury instructions or dismissal with prejudice, will neither provide adequate deterrence nor compensate BAE for its efforts to combat Erwin's fraud. The Court cannot agree with Erwin that "'deterrence' against future misconduct in this case has effectively been accomplished by the Court's entry of … summary judgment … " [Doc. 71, pg. 5]. Because summary judgment was due to be granted with or without the fraud, letting Erwin off

9

without any further sanction would signal to Erwin and others that "they have everything to gain, and nothing to lose, by continuing to submit fabricated evidence." *Slate*, 941 F. Supp. 2d at 52. Therefore, as the Court noted in its memorandum opinion and order, an award of attorneys' fees appears to be the only appropriate sanction [Doc. 63, pgs. 19–20]. To be sure, because Erwin's lawsuit has already been dismissed on the merits, there is no risk of erroneous judgment. But dismissal has not compensated any expenses BAE has incurred to counteract Erwin's fraud.

In its motion, BAE lays out those expenses. After the initial discovery period had closed, BAE was forced to depose Erwin once again and Ms. Owens twice more [Doc. 65-1, pgs. 3–4]. BAE's counsel spent at least 71.3 hours litigating the motion for sanctions [*Id.* at 4]. BAE documented $24,164.00 in attorneys' fees for that time, plus $5,483.21 in costs associated with the additional depositions [Doc. 65].

Erwin's response to the motion for attorneys' fees does not contest the reasonableness of these amounts, [*see* Doc. 71] and indeed, the fees requested appear reasonable. Courts may award "reasonable" attorneys' fees guided by the lodestar method, which calls for multiplying a reasonable amount of time spent on a case by a reasonable hourly rate. *Geier v. Sundquist*, 372 F.3d 784, 792 (6th Cir. 2004). For the reasonable hourly rate, "[c]ourts look to the prevailing market rate in the relevant community—or that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 899 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000).

Two attorneys, Thomas M. Winn and Joshua R. Treece, conducted all the work for which BAE claims fees in connection with its motion for sanctions [*See* Doc. 65-1]. Of that time, Winn spent relatively little—3.8 hours billed at approximately $472.11 per hour—on review of

discovery, strategy, and some correspondence [*Id.* at 2]. Treece billed the remaining 67.5 hours at approximately $310.00 per hour [*See id.*]. He spent about 15.9 hours on an initial review of the newly revealed documents, researching the potential sanctions motion, and preparing to meet and confer with opposing counsel regarding that motion [*Id.* at 2–3]. He spent 11.3 hours preparing for the 4-hour second deposition of Owens [*Id.* at 3]. He spent 13.5 hours preparing for and conducting the third and second depositions of Owens and Erwin respectively [*Id.* at 3–4]. Finally, he spent 22.8 hours drafting the initial memorandum and reply in support of the motion for sanctions and preparing for and attending the hearing [*Id.* at 4]. The time spent by Winn and Treece appears reasonable. Further, based on the Court's knowledge of the prevailing market rate in this community, attorneys Winn and Treece charged this time at a reasonable rate.

      Although the requested fees are reasonable, Erwin avers that her financial situation renders her incapable of paying them while continuing to support herself and her 12-year-old grandson [Doc. 72, ¶ 5]. "[F]ee awards are at bottom an equitable matter, [and] courts should not hesitate to take the relative wealth of the parties into account." *Shangold v. Walt Disney Co.*, 275 F. App'x 72, 74 (2d Cir. 2008) (quoting *Faraci v. Hickey-Freeman Co.*, 607 F.2d 1025, 1028 (2d Cir. 1979)). BAE is a military contractor that operates the U.S. Army's ammunition plants in Kingsport, Tennessee and Radford, Virginia [Doc. 71, pg. 5 n. 2]. Erwin is a single, 57-year-old provider for her grandson whose assets are mostly illiquid, whose liabilities are substantial, and who loses more money each month than she earns [Doc. 72, ¶¶ 6–11; Doc. 72-1]. She details $3,963 in net income and $4,072 in monthly expenses. Some of those expenses include $260.00 in tutoring expenses, $202.00 in a "Best Egg loan" and miscellaneous credit card payments of $400.00 per month [Doc. 72-1]. As detailed in her affidavit, her assets are her home, whose value she does not estimate, a total of $69,600 in two different 401(k) accounts, and $1,400 in savings [Doc. 72, ¶¶ 8, 10]. Her

11

liabilities are approximately $122,000 on her home's mortgage, $11,000 in tax arrearages, and student loan debt of $69,000 [*Id.*, ¶¶ 7–8, 11]. Thus, she has a positive net worth and although her total monthly expenses exceed her net income, some of those expenses are best characterized as variable.

The Court notes that BAE has requested $4,682.30 in costs associated with the litigation [*See* Doc. 69]. Moreover, Fed.R.Civ.P. 54(d) entitles BAE to collect its costs associated with the motion for sanctions. *See Goostree v. State of Tenn.*, 796 F.2d 854, 864 (6th Cir. 1986) ("The rule establishes a norm of action: prevailing parties are entitled to their costs as of course.") (quoting *Coyne-Delany Co. v. Capital Development Bd. of State of Ill.*, 717 F.2d 385, 392 (7th Cir. 1983)). In considering the equities of this situation and considering the need for deterrence and the culpability of Owens in this collusion as well, imposing the full $24,164.00 in attorneys' fees on Erwin would be, on balance, inequitable. But, the Court cannot give her a free pass when her conduct is as egregious as it was. Therefore, balancing the need to deter Erwin and others like her from future fraud, compensate BAE for losses due to Erwin's conduct in this litigation, and account for Erwin's ability to pay, the Court finds an award of **$10,000.00** in attorneys' fees is reasonable.

Accordingly, BAE's motion [Doc. 65] is **GRANTED IN PART AND DENIED IN PART**. The Court **AWARDS** $10,000.00 in attorneys' fees, plus costs.[3] The Clerk is **DIRECTED** to close the case.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge

---

[3] To the extent costs associated with the motion for sanctions were not included in BAE's first bill of costs [Doc. 69], the Parties shall file any necessary additional bills of costs in accordance with Local Rule 54.1 and the Court's Guidelines on Preparing Bills of Costs. The Clerk has authority to tax costs. *See* Fed.R.Civ.P. 54(d)(1).

12